**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |  |
|---|---|---|
| RUSSELL ROACH<br>2527 South Kenmore Court<br>Arlington, Virginia 2206<br><br>  Plaintiff,<br><br>  v.<br><br>UKG INC.<br>2250 N. Commerce Parkway<br>Weston, Florida 33326<br><br>Serve: CT Corporation System<br>   4701 Cox Road, Suite 285<br>   Glen Allen, Virginia 23060<br>   Registered Agent<br><br>  Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. _____ |

**COMPLAINT**

COMES NOW THE PLAINTIFF, RUSSELL ROACH, by counsel, and moves this Court

for entry of judgment in his favor, and against the Defendant, UKG INC., and in support of such

motion alleges and avers as follows:

**NATURE OF ACTION**

This action states a federal claim of retaliation, hostile work environment, and

discrimination against the Defendant, arising out of the creation and maintenance of a hostile,

discriminatory and retaliatory working environment during Plaintiff's employment, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the Virginia Human

Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at

Va. Code § 2.2-3900, *et seq.*

This action also states a claim for retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*, and ultimately termination, after Plaintiff exercised his FMLA rights.

## PARTIES

1.      Plaintiff Russell Roach ("Mr. Roach") is a resident and citizen of Arlington County in the Commonwealth of Virginia.  At all times relevant hereto, Mr. Roach was employed by the Defendant, working remotely out of his home in Arlington, Virginia, in this judicial district.

2.      Defendant UKG Inc. ("UKG") is a foreign (Delaware) corporation, headquartered in Weston, Florida, and active and in good standing in the Commonwealth of Virginia.

3.      UKG is an American multinational technology company with dual headquarters in Lowell, Massachusetts, and Weston, Florida. UKG provides workforce management and human resource management services, and specifically, cloud based Human Capital Management solutions for human resources, pay, time, and culture solutions.

4.      Mr. Roach was an "employee" of UKG within the meaning of 42 U.S.C. § 2000e(f) and Va. Code § 2.2-3905(A), and an "eligible employee" of UKG within the meaning of 29 U.S.C. §2611(2)(A).

5.      UKG is an "employer" within the meaning of 42 U.S.C. §2000e(b) and 29 U.S.C. §2611(4)(A) and Va. Code § 2.2-3905(A).

6.      UKG is engaged in an industry affecting commerce and had over 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b), and more than five employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of Va. Code § 2.2-3905.1(A).

7.    UKG is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4) (A).

## JURISDICTION AND VENUE

8.    The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

9.    The causes of action alleged in this action arose or originated within the Eastern District of Virginia.

10.    Mr. Roach was, at all times relevant hereto, a resident and citizen of this judicial district and at all times relevant hereto, was employed by the Defendant in this judicial district.

11.    UKG is present in and regularly conducts business in this judicial district, and the acts complained of herein occurred in this judicial district.  Therefore, the Defendant is subject to the personal jurisdiction of this Court.

12.    The unlawful employment practices in this case were committed in this judicial district, and Mr. Roach would still be employed in this judicial district, continuing to work for the Defendant, but for the Defendant's unlawful practices.

13.    This Court has jurisdiction over Mr. Roach's claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*, the Family and Medical Leave Act, 9 U.S.C. § 2617, and under the common law of Virginia.

14.    Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

16.    Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

17.    Mr. Roach timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and a Complaint of Discrimination with the Commonwealth of Virginia, Office of Attorney General – Office of Civil Rights ("OCR") on July 11, 2024.

18.    On August 9, 2024, the OCR notified Mr. Roach that it ceded investigative authority to the EEOC pursuant to the worksharing agreement between those entities.

19.    The EEOC issued a Right to Sue on July 9, 2025.

20.    This action is timely filed.

## BACKGROUND

21.    Mr. Roach began his employment with UKG, Inc. ("UKG") on May 31, 2005 in the position of Project Manager.  Mr. Roach performed well, as evidenced by his positive performance reviews and progression within the company.  Mr. Roach held the role of Senior Manager Business Process before the events complained of herein, which resulted in his title being changed to Principal Technical Program Manager after his leadership responsibilities were removed, as described in more detail below.

22.    After his supervisor, Susan Romanick, retired in December 2022, Mr. Roach began reporting directly to Hennie Strydom ("Mr. Strydom"), VP, Value Stream Acceleration, in January 2023.  At some point after that, Mr. Strydom asked that Mr. Roach begin reporting to Susan Cox ("Ms. Cox") Director, Value Stream Acceleration Services, with a dotted line reporting relationship to him.  Mr. Roach continued to receive positive feedback on his performance.

23.     In April 2023, Mr. Roach took FMLA paternity leave. When Mr. Roach returned from leave, Mr. Roach learned that Ms. Cox was interviewing candidates for his team in response to a job description Mr. Roach had posted for a Senior Business Process Analyst. Mr. Roach immediately became involved in the interviewing process.

24.     Ms. Cox and Mr. Roach each interviewed the candidates – a Caucasian candidate from Massachusetts, who lacked all the necessary qualifications, and another, qualified candidate who had recently migrated to south Florida from Ecuador, with impressive experience.  Lisa McKenzie, the Lead Process Consultant on his team, agreed with Mr. Roach that the candidate from Ecuador was the most qualified and the best fit for the position.

25.     Ms. Cox, however, preferred the (Caucasian) Massachusetts candidate despite her lack of qualifications, and expressed concerns about the Ecuadorian candidate's "heavy Spanish accent."  Ms. Cox is also Caucasian.  Mr. Roach refused to hire the candidate from Massachusetts for the senior position, and explained to Ms. Cox that it would not be fair, nor could he justify hiring someone with no experience in the field at the same level as the existing Senior Business Process Analysts.

26.     Ms. Cox and Mr. Roach revisited this conversation multiple times, and Mr. Roach remained steadfast in his objection to hiring a candidate with no experience into a Senior level position.  Mr. Roach continued to express his desire and preference to hire the qualified, Ecuadorian candidate for the senior level position.

27.     Ultimately, Mr. Roach was overruled, and Ms. Cox hired the unqualified candidate for the senior level role.

28.     In or around late July, 2023, Mr. Strydom informed Mr. Roach that he would be moved to an individual contributor role and would no longer be leading his team.

29.    After that, during a 1:1 with Mr. Strydom, Mr. Strydom made Mr. Roach aware that some misconceptions that were circulating about Mr. Roach and his work.  Mr. Strydom did not offer any specifics, or the identity of any individuals making the statements.

30.    On July 14, 2023, Mr. Roach sent an email to Mr. Strydom to address the unfounded accusations, since Mr. Roach was becoming increasingly concerned that a false narrative was being created about his attitude and work. Mr. Roach wrote:

> I have been a loyal and productive employee of this company for 18 years. I have designed and implemented solutions that are still running in the company today, and that have contributed to our success and reputation. I have worked with countless people in cloud, engineering, support, sales, and marketing, and I have always respected their expertise and opinions.

31.    Mr. Roach asked that Mr. Strydom speak with the stakeholders involved for accurate feedback.  In her response, Mr. Strydom admitted that he believed some of what was being said about Mr. Roach's personality and/or communication style was "misplaced."

32.    All of this started after Mr. Roach took FMLA leave, and after he repeatedly objected to Ms. Cox refusing to hire the qualified candidate because of her "heavy Spanish accent."

33.    In August 2023, Mr. Strydom announced to the department that his teams would be required to use the "Aha!" project management tool (a project planning software with road mapping capabilities, idea management, project management, and features for setting strategy and goals).

34.    During the August/September 2023 time frame, Mr. Roach was transitioned away from Ms. Cox, and began reporting to Mr. Hoenninger.

35.    Shortly thereafter, Mr. Roach travelled with Rolando Coto ("Mr. Coto") (Senior Program Manager) to UKG's Lowell, Massachusetts office to plan the next project – "Project Intake." After two days of brainstorming meetings, Mr. Hoenninger and Ms. Cox removed Mr.

Roach and Mr. Coto from the Project Intake, and assigned them to the Work Management project instead.  Mr. Roach raised concerns about prioritizing Work Management over Project Intake but was told to focus on Work Management

36.     In September 2023, Mr. Roach requested Kam Odom, Change Manager, be added to the project and she created a six-week implementation plan for Work Management, which was reduced to two weeks by Ms. Cox and Mr. Hoenninger.  Mr. Roach raised concerns about the removal of the change management and training aspects from the project, and shared the negative impact it would cause.  Mr. Roach explained that it would cause the rollout to fail, which would result in more time spent trying to fix the process and slow things down.  His concerns fell on deaf ears, and as a result, Mr. Roach was set up for failure.

37.     In October, 2023, the Work Management project was rolled out (on the two week schedule), and failed, just as Mr. Roach predicted.

38.     Following the project's failure, a spreadsheet was created by Mr. Coto as a temporary solution at the request of Mr. Hoenninger and Ms. Cox.  Mr. Roach advised Mr. Hoenninger and Ms. Cox that they needed move away from the spreadsheet because it was only a temporary solution, but his concerns were ignored.

39.     On October 11, 2023, the project team was directed to switch its focus to Intake Optimization.  Once again, Mr. Roach raised concerns – that this would cause further confusion and that they needed to complete Work Management first - but once again, his concerns were ignored.

40.     On October 12, 2023, Mr. Roach's access to Aha! was reduced from power user to general user, impacting his ability to implement changes.  Mr. Roach notified Mr. Hoenninger, Ms. Cox and Mr. Coto that the lack of administrative access could negatively impact the changes

being implemented and slow down the project. Nevertheless, his "power user" status was not restored.

41.    That same day, during a 1:1 meeting with Mr. Hoenninger, Mr. Hoenninger told Mr. Roach that they "needed a win" and it was decided that Mr. Roach would work with Jennifer Madel ("Ms. Madel"), Manager, Agile Coaching, on redesigning her team's intake process.

42.    Mr. Roach received final approval from Ms. Madel for his proposed changes on October 26, and submitted the change request to the tools team.

43.    Ultimately, Mr. Roach's change request was canceled on November 30 by tools team leader Terri Mason, who stated, "[w]e re not currently accepting requests for new or changes to Ideas Portals." Mr. Roach forwarded Ms. Mason's response to Mr. Hoenninger, who said he would follow up with Ms. Mason that day. Mr. Roach advised Mr. Hoenninger that if "they can't do the changes we need, I need my access re-instated even if it's just for the next couple months. Between VSAS Work management and LPM we have a lot to do."

44.    Mr. Roach also notified Mr. Strydom to ensure Mr. Strydom understood the reason for the delay, and that it was out of Mr. Roach's control.

45.    In December 2023, Mr. Roach turned his attention back to Work Management. On December 1, Mr. Roach again shared with Mr. Hoenninger that the lack of access to Aha! was impacting his ability to work effectively, and was slowing things down. Mr. Roach requested a Pilot workspace (a temporary test installation of the new program) to complete the work management project.

46.    On December 1, 2023, Mr. Roach raised concerns with Mr. Hoenninger about the lack of effective temporary access to Aha!, which continued to impede his ability to do his job.

47.    On December 7, 2023, Mr. Hoenninger agreed to temporarily restore Mr. Roach's administrative access for the approved changes.

8

48.     On December 11, 2023, Mr. Roach received the lowest performance review he had received in approximately 18 years.  Mr. Roach did not receive a merit increase, and he only received a 50% bonus despite meeting his documented goals for 2023.

49.     On December 12, 2023, Mr. Roach sent an email to Mr. Hoenninger to address the performance review.  Mr. Roach wrote, "In the first 9 months of the year, my performance was recognized as aligning with promotion criteria by Hennie [Strydom].  I'm puzzled about how my efforts and contributions in the subsequent months seemingly diminished my eligibility for even a minimal merit increase.  I am concerned that this evaluation might be influenced by my stance on a particular decision, which I expressed due to ethical considerations."

50.     The decision Mr. Roach was referring to was his opposition to Ms. Cox's hiring decision, and her refusal to hire the more qualified candidate after expressing concern about the candidate's "heavy Spanish accent."

51.     Mr. Roach also pointed out the lack of any verbal or written feedback to support the contention in the review that his approach on a particular project was inflexible, and he asked for examples of his alleged failure to demonstrate ownership.  None were provided.

52.     Mr. Roach concluded, "I seek a more balanced evaluation that considers my consistent efforts and contributions throughout the year.  I'm open to constructive feedback and eager to work on any identified areas of improvement, but I believe that a fair and comprehensive review is crucial for my professional development."

53.     Notably, the Work Management project was not included as one of Mr. Roach's goals for 2023, and therefore, should not have been a factor in determining whether Mr. Roach met his documented goals for 2023.  Even if it had been, FY2024 goals began on October 1, so the Work Management project should have been evaluated as part of his FY2024 review, not FY2023.

54.     In January, 2024, Kam Odom, who had been assigned to the Work Management project at Mr. Roach's request as the Change Management expert, was pulled off the project.

55.     In mid-January, 2024, Mr. Roach's request for a pilot space was approved, and Mr. Coto and Mr. Roach initiated the pilot project.

56.     In mid-February 2024, Mr. Roach and Mr. Coto received positive feedback from the pilot team; however, Mr. Hoenninger asked them to wait for approval before going live.

57.     Shortly after that, and before the program went live, Mr. Roach was advised that Mr. Coto had been reassigned to another program area.  Although Mr. Roach was assured someone else would be assigned, no other Program Manager was assigned to support him.  With this latest change, Mr. Roach was essentially isolated from the project team.

58.     On March 1, 2024, Mr. Roach was placed on a Performance Improvement Plan (PIP) which contained no clear or measurable areas for improvement. Mr. Hoenninger informed Mr. Roach the PIP would not end until April 5, 2024 (longer than 30 days) since he would not be available to meet earlier in the week.

59.     Mr. Roach expressed that the PIP seemed unwarranted since he had kept Mr. Hoenninger aware of all roadblocks, and Mr. Hoenninger had continually assured Mr. Roach that he and Mr. Strydom (Mr. Hoenninger's supervisor) were working to remove the roadblocks.

60.     Mr. Roach was instructed that during the PIP period he would be required to work in two-week "sprints" (*i.e.*, a time-boxed period during which he would work on a specific set of objectives, benchmarks, or outputs).

61.     During the first two-week sprint, Mr. Roach was tasked with reviewing a solution for intake that had been discussed between Ms. Cox, Mr. Hoenninger, and Ms. Mason.  Mr. Roach faced backlash for sharing feedback that the solution they came up with would not meet their business needs.  Mr. Roach was told he should have challenged Ms. Mason's proposed

solution even though Mr. Roach had no written requirements related to it, and had not been included in the meeting where Ms. Mason was asked to come up with a solution.

62.    On March 13, 2024, Mr. Roach sent an email to Mr. Hoenninger expressing his concerns about the backlash he had faced in the meeting, explaining that he had performed the task asked for (reviewing the concept and reporting back on pros and cons), and had somehow become a target.

63.    During the second two-week sprint, Mr. Roach was tasked with enhancing a resource allocation algorithm that Mr. Hoenninger had been working on back in May/June 2023. This time Mr. Roach faced criticism for creating a functional solution in less than two weeks but not having it fully documented despite a successful demonstration.

64.    During the week of March 29, 2024, Mr. Roach met with HR to express concerns about being in a no-win situation and feeling as if he was being treated in a hostile manner, and intentionally set up to fail.  Mr. Roach felt as if his leadership team was purposefully working to delay progress while blaming him for the delays.  The only response Mr. Roach received was to continue doing his best to deliver what was asked of him.

65.    Mr. Roach continued working on assigned tasks, and submitting all requested information.

66.    On April 5, 2024, Mr. Roach was terminated, allegedly due to "unmet performance expectations."

67.    After 18 years and 10 months, Mr. Roach received his last paycheck for the week he worked and left with no severance.

68.    After Mr. Roach took FMLA leave, and after he opposed and resisted Ms. Cox's refusal to hire the more qualified (and the *only* qualified) candidate for a senior level role of the

two under consideration, UKG engaged in a retaliatory course of conduct against him. This included, but is not limited to:

- Removing Mr. Roach from his team leadership role;

- Facilitating a false narrative about his work and attitude/personality;

- Removing and/or transferring Mr. Roach between projects and ignoring his concerns regarding the detrimental impact;

- Ignoring Mr. Roach's concerns that the shortened timeline of a project would cause it to fail, which it did, and then ignoring his suggestions about fixing it;

- Downgrading Mr. Roach's Aha! access from power user to general user, making it difficult, if not impossible, for Mr. Roach to perform his job in an efficient and effective manner;

- Holding Mr. Roach accountable and blaming him for project delays out of his control, and about which Mr. Roach communicated with Mr. Hoenninger and Mr. Strydom (who said they would help to remove the roadblocks);

- Giving Mr. Roach a poor performance review with no documented support or justification;

- Awarding Mr. Roach only a 50% bonus, and no merit increase, for 2023;

- Including the Work Management project as a factor in Mr. Roach's 2023 review, which was not one of his documented goals (and, even if it had been, should not have been included in FY2023 review);

- Transferring project team members away from Mr. Roach so that Mr. Roach was isolated and alone on the Work Management project, and not providing any replacement support despite assurances that Mr. Roach would get help;

- Placing Mr. Roach on an unwarranted and unjustified Performance Improvement Plan which contained no clear or measurable areas for improvement;

- Criticizing Mr. Roach for the proper performance of tasks requested of him during his sprint cycles;

- HR ignoring Mr. Roach's concerns that he was being treated in a hostile manner and set up to fail, and instead of addressing his concerns, telling Mr. Roach to just continue to do whatever he is asked to do; and

12

- Terminating Mr. Roach's employment, with no legitimate business reason, after 18+ years, with no severance.

69. Mr. Roach was retaliated against because he took leave pursuant to the FMLA< and then, after he returned, he resisted and objected to UKG's discriminatory refusal to hire the most qualified candidate for a senior level position after Ms. Cox expressed concerns about the candidate's "heavy, Spanish accent."

**COUNT ONE -**
**RETALIATION/HOSTILE WORK ENVIRONMENT/**
**DISCRIMINATION IN VIOLATION OF TITLE VII**

70. The allegations of the foregoing paragraphs are incorporated as if realleged herein.

71. UKG retaliated against Mr. Roach and subjected him to a hostile and retaliatory work environment because he resisted and objected to UKG's discriminatory refusal to hire the most qualified candidate for a senior level position after Ms. Cox expressed concerns about the candidate's "heavy, Spanish accent."

72. Ms. Cox and Mr. Roach both interviewed the candidates in April 2023, and revisited the conversation multiple times. Mr. Roach remained steadfast in his objection to hiring a candidate with no experience into a Senior level position. Mr. Roach continued to express his desire and preference to hire the qualified, Ecuadorian candidate for the senior level position.

73. After that, his work environment changed, and Mr. Roach was subjected to a continuing course of retaliation, creating a hostile work environment. Such acts include:

- Removing Mr. Roach from his team leadership role;

- Facilitating a false narrative about his work and attitude/personality;

- Removing and/or transferring Mr. Roach between projects and ignoring his concerns regarding the detrimental impact;

13

- Ignoring Mr. Roach's concerns that the shortened timeline of a project would cause it to fail, which it did, and then ignoring his suggestions about fixing it;

- Downgrading Mr. Roach's Aha! access from power user to general user, making it difficult, if not impossible, for Mr. Roach to perform his job in an efficient and effective manner;

- Holding Mr. Roach accountable and blaming him for project delays out of his control, and about which Mr. Roach communicated with Mr. Hoenninger and Mr. Strydom (who said they would help to remove the roadblocks);

- Giving Mr. Roach a poor performance review with no documented support or justification;

- Awarding Mr. Roach only a 50% bonus, and no merit increase, for 2023;

- Including the Work Management project as a factor in Mr. Roach's 2023 review, which was not one of his documented goals (and, even if it had been, should not have been included in FY2023 review);

- Transferring project team members away from Mr. Roach so that Mr. Roach was isolated and alone on the Work Management project, and not providing any replacement support despite assurances that Mr. Roach would get help;

- Placing Mr. Roach on an unwarranted and unjustified Performance Improvement Plan which contained no clear or measurable areas for improvement;

- Criticizing Mr. Roach for the proper performance of tasks requested of him during his sprint cycles;

- HR ignoring Mr. Roach's concerns that he was being treated in a hostile manner and set up to fail, and instead of addressing his concerns, telling Mr. Roach to just continue to do whatever he is asked to do; and

- Terminating Mr. Roach's employment, with no legitimate business reason, after 18+ years, with no severance.

74. One week prior to his termination, Mr. Roach met with HR to express concerns about being in a no-win situation and feeling as if he was being treated in a hostile manner, and intentionally set up to fail. HR offered no help, and took no action whatsoever to address his complaints and concerns – instead, telling him to just keep "doing his best."

14

75.     Exactly one week later, after 18 years and 10 months of employment, Mr. Roach was terminated, without warning or justification, with no severance.

76.     Mr. Roach was retaliated against, subjected to a hostile work environment, and terminated in retaliation for against after he resisted and objected to UKG's discriminatory refusal to hire the most qualified candidate for a senior level position after Ms. Cox expressed concerns about the candidate's "heavy, Spanish accent."

77.     UKG engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Roach, within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*.

78.     As a direct and proximate result of UKG's actions, Mr. Roach has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

79.     Due to the conscious disregard for Mr. Roach's federally protected rights, and the severity of UKG's conduct, Mr. Roach is also entitled to punitive damages.

**COUNT TWO -**
**RETALIATION/HOSTILE WORK ENVIRONMENT/DISCRIMINATION IN**
**VIOLATION OF THE VIRGINIA HUMAN RIGHTS ACT/VIRGINIA VALUES ACT**

80.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

81.     UKG retaliated against Mr. Roach and subjected him to a hostile and retaliatory work environment because he resisted and objected to UKG's discriminatory refusal to hire the

15

most qualified candidate for a senior level position after Ms. Cox expressed concerns about the candidate's "heavy, Spanish accent."

82.  Ms. Cox and Mr. Roach both interviewed the candidates in April 2023, and revisited the conversation multiple times.  Mr. Roach remained steadfast in his objection to hiring a candidate with no experience into a Senior level position.  Mr. Roach continued to express his desire and preference to hire the qualified, Ecuadorian candidate for the senior level position.

83.  After that, his work environment changed, and Mr. Roach was subjected to a continuing course of retaliation, creating a hostile work environment.  Such acts include:

- Removing Mr. Roach from his team leadership role;

- Facilitating a false narrative about his work and attitude/personality;

- Removing and/or transferring Mr. Roach between projects and ignoring his concerns regarding the detrimental impact;

- Ignoring Mr. Roach's concerns that the shortened timeline of a project would cause it to fail, which it did, and then ignoring his suggestions about fixing it;

- Downgrading Mr. Roach's Aha! access from power user to general user, making it difficult, if not impossible, for Mr. Roach to perform his job in an efficient and effective manner;

- Holding Mr. Roach accountable and blaming him for project delays out of his control, and about which Mr. Roach communicated with Mr. Hoenninger and Mr. Strydom (who said they would help to remove the roadblocks);

- Giving Mr. Roach a poor performance review with no documented support or justification;

- Awarding Mr. Roach only a 50% bonus, and no merit increase, for 2023;

- Including the Work Management project as a factor in Mr. Roach's 2023 review, which was not one of his documented goals (and, even if it had been, should not have been included in FY2023 review);

- Transferring project team members away from Mr. Roach so that Mr. Roach was isolated and alone on the Work Management project, and not providing any replacement support despite assurances that Mr. Roach would get help;

- Placing Mr. Roach on an unwarranted and unjustified Performance Improvement Plan which contained no clear or measurable areas for improvement;

- Criticizing Mr. Roach for the proper performance of tasks requested of him during his sprint cycles;

- HR ignoring Mr. Roach's concerns that he was being treated in a hostile manner and set up to fail, and instead of addressing his concerns, telling Mr. Roach to just continue to do whatever he is asked to do; and

- Terminating Mr. Roach's employment, with no legitimate business reason, after 18+ years, with no severance.

84.     One week prior to his termination, Mr. Roach met with HR to express concerns about being in a no-win situation and feeling as if he was being treated in a hostile manner, and intentionally set up to fail.  HR offered no help, and took no action whatsoever to address his complaints and concerns – instead, telling him to just keep "doing his best."

85.     Exactly one week later, after 18 years and 10 months of employment, Mr. Roach was terminated, without warning or justification, with no severance.

86.     Mr. Roach was retaliated against, subjected to a hostile work environment, and terminated in retaliation for against after he resisted and objected to UKG's discriminatory refusal to hire the most qualified candidate for a senior level position after Ms. Cox expressed concerns about the candidate's "heavy, Spanish accent."

87.     UKG engaged in these practices with malice and with reckless indifference to the statutorily protected rights of Mr. Roach, within the meaning of violated the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

17

88.     As a direct and proximate result of UKG's actions, Mr. Roach has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

89.     Due to the conscious disregard for Mr. Roach's statutorily protected rights, and the severity of UKG's conduct, Mr. Roach is also entitled to punitive damages.

**COUNT THREE -
RETALIATION IN VIOLATION OF THE
FAMILY AND MEDICAL LEAVE ACT**

90.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

91.     UKG retaliated against Mr. Roach for taking leave under the FMLA.

92.     Acts of retaliation which commenced upon Mr. Roach's return from FMLA leave included:

- Removing Mr. Roach from his team leadership role;

- Facilitating a false narrative about his work and attitude/personality;

- Removing and/or transferring Mr. Roach between projects and ignoring his concerns regarding the detrimental impact;

- Ignoring Mr. Roach's concerns that the shortened timeline of a project would cause it to fail, which it did, and then ignoring his suggestions about fixing it;

- Downgrading Mr. Roach's Aha! access from power user to general user, making it difficult, if not impossible, for Mr. Roach to perform his job in an efficient and effective manner;

- Holding Mr. Roach accountable and blaming him for project delays out of his control, and about which Mr. Roach communicated with Mr. Hoenninger and Mr. Strydom (who said they would help to remove the roadblocks);

- Giving Mr. Roach a poor performance review with no documented support or justification;

- Awarding Mr. Roach only a 50% bonus, and no merit increase, for 2023;

- Including the Work Management project as a factor in Mr. Roach's 2023 review, which was not one of his documented goals (and, even if it had been, should not have been included in FY2023 review);

- Transferring project team members away from Mr. Roach so that Mr. Roach was isolated and alone on the Work Management project, and not providing any replacement support despite assurances that Mr. Roach would get help;

- Criticizing Mr. Roach for the proper performance of tasks requested of him during his sprint cycles;

- HR ignoring Mr. Roach's concerns that he was being treated in a hostile manner and set up to fail, and instead of addressing his concerns, telling Mr. Roach to just continue to do whatever he is asked to do; and

- Terminating Mr. Roach's employment, with no legitimate business reason, after 18+ years, with no severance.

93. One week prior to his termination, Mr. Roach met with HR to express concerns about being in a no-win situation and feeling as if he was being treated in a hostile manner, and intentionally set up to fail. HR offered no help, and took no action whatsoever to address his complaints and concerns – instead, telling him to just keep "doing his best."

94. Exactly one week later, after 18 years and 10 months of employment, Mr. Roach was terminated, without warning or justification, with no severance.

95. Defendants terminated Mr. Roach because he exercised his right to take paternity leave, consistent with UKG's policies, and consistent with the FMLA.

96. UKG engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Roach, within the meaning of 29 U.S.C. § 2617, for which Mr. Roach is entitled equitable relief, including employment and reinstatement.

97.     As a direct and proximate result of the Defendant's actions, UKG has suffered and continues to suffer, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

98.     Due to the severity of the conduct, Mr. Roach is entitled to liquidated damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff RUSSELL ROACH requests that this Court enter judgment in his favor and against Defendant UKG INC. on the above Counts, and further:

(a)     Award Mr. Roach compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One, Two and Three; and in addition

(b)     Award Mr. Roach punitive and exemplary damages, to be determined by a jury, on Count One; and in addition

(c)     Award Plaintiff liquidated damages on Count Three; and in addition

(d)     Award Mr. Roach appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and in addition

(e)     Award Mr. Roach attorneys' fees and the costs of this action; and in addition

(f)     Award Mr. Roach such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF RUSSELL ROACH DEMANDS A TRIAL BY JURY.**

October 6, 2025                                  Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
  BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20191
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Russell Roach*